Everybody's here. Mr. Moss, you may proceed. Thank you, Your Honor. May it please the Court, my name is Aaron Moss. I represent the appellate Mr. Johnson in this appeal. My colleague, Ryan Kennedy, is also present. He represents the co-appellant, Ms. Stewart. The appeal raises six issues, and I'll be covering one, two, three, and six. Mr. Kennedy will take four and five. But the issues in this appeal are intertwined, and their cumulative effect compounded the prejudice against the defendants, caused their case to become corrupted, and deprived them of a fair trial. The misconduct, the error, and the prejudice towards the defendants in this case started early, but it was pervasive throughout trial, pretrial, and sentencing. The first issue is the prosecution's failure to disclose and preserve Mr. Mercado Medrano's cell phone. It's violated defendants' due process rights and denied them a fair trial. Now, due process violations are reviewed de novo, and a de novo review in this case shows that defendants' due process rights were violated through the government's failure or refusal to disclose its possession of Mercado Medrano's cell phone until after they had already failed to preserve it. Specifically, the government violated the defendants' due process rights on this issue when they suppressed the cell phone by failing to provide the defendants with even inquiry notice that they ever had possession of it until after they failed to preserve it. That cell phone was material to the defendants. It contained impeachment evidence, and it contained potentially exculpatory evidence. Mr. Mollis, how do we know that? How do we know that it contained, how do we know that it was material, that it contained impeachment evidence, Your Honor? The phone was objective evidence in contrast to the possibly biased and certainly conflicting testimony of witnesses like Levi Conley, Robert Haynes, Coach Scott, he held. And there's a reasonable probability, which is what's needed for materiality in this case, that the phone would clarify conflicting testimony or undermine the confidence of these witnesses, specifically when they were testifying about their texts with Mercado Medrano. Levi Conley's testimony dealt with his texts directly to Mercado Medrano, and that was J.A., I believe it's around 9-59. Robert Haynes' testimony about his communications with Mercado on his phone. BL's testimony about texts between him and Mercado Medrano. This is also relevant as impeachment for the, their testimony and Larkin Hite's marijuana use versus the lack of marijuana metabolites in the drug tests. What's important here is that the record indicates that Mr. Mercado Medrano shows up at the Motel 6 with a bag of substance that he claims to be marijuana. There's testimony that marijuana was smoked that night. However, no toxicology result for Mr. Mercado Medrano actually contained any indication that there was marijuana metabolite. But Mr. Moss, didn't the government make available at least some of the texts related to this so-called lace blunt? And so that was there, so I'm not exactly sure what else the phone would have contributed to that. The government made available screenshots that it took for Larkin Hite's phone that showed texts between her and Mercado Medrano. Without Mercado Medrano's cell phone, it can't be said whether or not those texts were manipulated before they were shown to the government. But this evidence... What do you mean by manipulated? What does that mean? Well, Your Honor, texts can be deleted off of the phone and then shown to the government. We're not certain if we got the whole story there. Certainly we did not because there were texts before that time. But what this evidence, what the cell phone is particularly important for is impeachment of the witnesses who testified to texting Mercado Medrano that night. It is also potentially exculpatory. And Your Honor, the only reason I cannot stand here before you and argue that the cell phone contained exculpatory, aside from the impeachment evidence, is because the government never conducted an analysis of it. And by failing to disclose they possessed it until they failed to preserve it, they prevented any outside analysis from defense counsel. Now, this Judge King, Mr. Moss, my understanding is they gave the phone back to the family after the guilty plea? Your Honor, they gave the phone back to the family after the... Well, before the first plea hearing. And that, of course, that plea was rejected. So, again, there's no... I thought the guilty plea was entered before the magistrate judge. They gave the phone back after that. And then the district judge rejected the plea agreement. That is accurate, Your Honor, based on what... All right. Did they give it back to the family after consulting with the prosecutor? No, Your Honor. Was this a decision made by the investigator? Or do you know whether the record showed it? Your Honor, a huge issue in this case is that there is absolutely zero documentation from law enforcement about this cell phone. There's no documentation... So, you don't know... The record doesn't show when it was given back or who made the decision to give it back? It doesn't show anything. There's no investigation report, property disposition report, notice, memorandum, correspondence, communications, documents about the seizure, the receipt, possession, or the return of the cell phone. There are... There's no testimony or affidavits about it at all? Nothing, Your Honor. There's a complete... Counsel, how do you know they had it? Well, because they admitted that they had it. After the plea was rejected, a supplemental discovery request was submitted by the defendants. And one of the requests was this cell phone. And they admitted that they had it, even though there was absolutely no discovery. Absolutely. What did you trailed off? You said Your Honor, the government admitted that they possessed this cell phone. However, that is the only evidence of their possession. Again, there is nothing in the records... So, at the same time they acknowledged... At the same time they acknowledged they had it, they were also informed that they didn't have it. That's correct, Your Honor. Was it given back? Is it your position that the cell phone was returned to the family by virtue of negligence on the part of the officers and the government or in bad faith? Your Honor, I think it amounts to bad faith. And I think that United States v. Oakland, which was decided by a district court within the Fourth Circuit, helps to demonstrate why these actions amount to bad faith. Law enforcement basically has no good faith basis for its reckless disregard and total failure of the established procedure here. The law enforcement officer who admitted to taking the phone, he had 25 years of experience. He knew the proper procedures. He testified those procedures were documenting every step, preserving evidence, clear chains of custody, including noting disposition. He stated that when he does not write something down, it did not happen. Then he admitted that there's no written documentation about seeking, receiving, possessing, analyzing, or disposing of the cell phone. There are zero records of law enforcement possessing the cell phone. And those zero records show that he acted in a manner contrary to applicable procedure in regards to this evidence. He, Your Honor, said he did not conduct any analysis of the phone. There was no attempt to assess its exculpatory value, even though it had material value that was apparent. The record is completely devoid of evidence that the officer being active pursuant to any applicable controlling procedure. And that is important because United States v. Elliott found that bad faith exists when conduct is knowingly engaged or when it's reckless. That's ill. You have to show bad faith or is that what this is about? Well, Your Honor, if the court believes that there was impeachment evidence, then I don't think we have to get to bad faith. However, if the court believes that this cell phone possessed potentially exculpatory evidence, then we do need to show bad faith. However, I think bad faith can be shown. And as Elliott found, bad faith is shown when law enforcement acts in a manner which was either contrary to applicable policies and the common sense assessment of evidence reasonably to be reasonably effective law enforcement or so unmindful of both as to constitute the reckless disregard of both. There is a showing of objective bad faith. Elliott held that the loss of evidence without first attempting to assess its exculpatory value constitutes bad faith because the controlling regulations clearly teach that there's a critical link between due process of law and the destruction of evidence and clearly require that an assessment of evidentiary value be made to that evidence. Like Elliott, none of the controlling regulations were followed here. The conduct was... What remedy did you seek from the district court as a result of the absence of the cell phone? The remedy I saw was a motion or that Mr. Johnson saw was a motion to dismiss for failure to preserve the cell phone. Did you seek anything less than that? Well, when the court denied the motion to dismiss, Your Honor, we saw an adverse inference jury instruction, which the court... There's two things. Did you try to get the phone back? We did try to get the phone back, Your Honor. We subpoenaed the phone from the family. The family came in and testified that they had lost the phone after the government had given it back to them. What was also interesting in this case, and I think it highlights the importance of documentation and the shortfalls of the law enforcement not having any documentation about the cell phone in this case, is that the family's original testimony was that they had given the government two cell phones that belonged to Mercado Medrano, but only one was returned. There was confusion throughout the record about the cell phone. I think that, frankly, the complete lack of documentation on the government's part for this cell phone is reckless. It is completely against the controlling regulations, and it amounts to bad faith. These are the same... Did you say you asked for an instruction, a spoilation instruction? That's correct, Your Honor. We asked for... And it was denied? And it was also denied, Your Honor, yes. The jury should have been told that they were permitted to infer that the government appeared to produce this phone based on the fear that it would have exposed facts unfavorable to prosecution. The district court refused to give that instruction. I understand I am over my time, and I am happy to continue to go on. I would like Mr. Kennedy to have an opportunity to address the court, but if there are any additional questions with regards to issues one, two, three, or six, I am more than happy to answer them from the court. All right. Thank you, Mr. Moss. Mr. Kennedy? Thank you, Your Honor. May it please the court, my name is Ryan Kennedy. I represent the appellant, Ms. Stewart, in this case. I'm going to start by arguing with a motion for acquittal, which is something that only has to do with my client, not Mr. Moss's client. And in doing so, I have to argue the facts in the light most favorable to the government as per a motion for acquittal. So, to be clear, I'm not admitting that this is actually what happened, but I'm taking the facts in the light most favorable to the government here. In that light, there were two drug sales. In the first sale, Ms. Stewart was seeking marijuana, and Johnson and Stewart met Marcotto in a motel room where then Johnson sold drugs to Marcotto, Conley, and BL in exchange for marijuana and cash. Stewart then actively participated in the light most favorable to the government, including cutting lines, and then Johnson, Stewart, Marcotto, Conley, and BL were all participants. Marcotto, as part of this first transaction, ingests the line, and Stewart acquires her marijuana. At that point, the first transaction ends, and then there's a break. During this break, Marcotto felt fine. He walked around without difficulty, the evidence shows. He drove Johnson and Haynes in a car to an ATM, and then he properly operated that ATM to obtain more cash. Then he was able to drive back to the hotel room in a span of some time while Ms. Stewart was sitting in the hotel room. At this point is when the second sale kicks off. Marcotto and Haynes pay Johnson for an eight ball, and Marcotto does not partake of the eight ball in front of them, but puts it in his pocket and leaves. Haynes participates, but Conley and BL do not participate in this second transaction. After the second sale, Marcotto drives other people home, then he drives to Waffle House, he orders food, and then he drives away. Sometime hours later, he is found dead with morphine in his system. How do we know these are two separate transactions? Well, we looked at the Letterlo case that this court decided back in 1995. In that case, which approved of the U.S. v. Washington case in the Fifth Circuit, there were two drug sales. It's almost directly on point here. There were two drug sales, and this court said, and I'm quoting from this court from Letterlo, Letterlo's two drug sales, although perhaps occurring pursuant to a master plan to sell crack cocaine as a business venture, had hardly been said to constitute a single occasion. If we went into a drug store to purchase aspirin, the transaction would be complete once we left the store with the pills, even though the drug store was still open for business. Similarly, each of Letterlo's drug sales was a complete final transaction and therefore an independent offense, unquote. So the key is that we're distinguishing one event versus two, and how do we do that? Well, the key question we have to ask ourselves is, does the person have an opportunity to pause and decide whether to engage in further criminal activity? That's what this court has said. So in this case, there is certainly a pause for Ms. Stewart because she was, after this first transaction, she's sitting in the motel room while other people go and get cash and then come back and engage in a second transaction. And as this court has found, mere presence when a drug deal or some other activity is going on is not enough. Mr. Kennedy, can I ask a question? Absolutely, Your Honor. As I understand it, the government simply needed to prove that Stewart aided and abetted the drug sales. And I wonder if we can see the point that these may have been two separate drug sales. Why isn't the evidence that shows that, for example, that she was the one who used her email address to reserve the motel room, she carried the duffel bag full of drugs into the room, she helped lead these kids into the motel, she remained in the room with Mario Medrano's friends while Medrano and Johnson went to the ATM to withdraw cash, and then remained in the room when Medrano paid Johnson for the second batch of drugs. Even putting aside the fact that mere presence isn't enough, we have a lot more than mere presence here. So why does it matter whether or not they're distinct sales if she was, I mean, she was in for, it seems like she was in for a penny in for a dollar here because she began as a co-actor with Johnson in this case. Well, Your Honor, thank you for the question. I think it's very important to distinguish that that what the court just listed as her active participants all happened prior to that pause I talked about. After the pause, that's when she was merely present. What do you consider to be the pause? What's the pause? The pause, Your Honor, is when the first transaction had completed and then several of her co-defendants, Medrano and a couple of other people, got into a car and Medrano drove them to an ATM where then he operated the ATM to get cash, and then come back to the motel room to complete a second transaction. Right, but your client remained in the motel room with the other kids. She didn't leave. Correct, Your Honor, but she had that pause to decide whether she wanted to engage in further criminal activity, and the evidence doesn't show that she did anything other than just be merely present during that second sale. What's the evidence that she did anything with respect to the first sale? Well, again, in the light most favorable to the government, she cut lines for people to consume the drugs from the first sale, and also, as Your Honor indicated, the evidence in the light most favorable to the government would show that she was carrying a duffel bag and things like that prior to the first sale. Why do you keep saying the light most favorable to the government? That's what the facts are here, but they want the case. We know that. Well, Your Honor, I'm just not... I apologize. You have to accept those facts. You have to accept those facts. We know that. Correct, Your Honor. I have to accept those facts, but I was just clarifying that I'm not admitting on behalf of my client that that's really what happened, but yes, for the purposes of the appeal, that's the facts we're working with. Yes, Your Honor. Mr. Kennedy, what she's shown on the video, what you call the second, her presence, you're saying that's just present. Don't you have to look at that presence in the context of her prior involvement in terms of U.S. studios, too, again? If all you had was that second one that's just present, it's different, but having involvement of cutting the drugs and Judge Diaz talked about in terms of the room and being with the young people in the interim, and then the second part you said is only present, but that's in the context of all the other involvement, isn't it? Well, Your Honor, as I said, I believe that there was that pause. Not the same pause, but this temporal pause is at best minutes, right? It's not days, and it's in the context of the actual involvement, just recent involvement, correct? And the same rest just died, you say, as you said, a lag, the thing happening, isn't it? Well, Your Honor, if I remember from the pause. Yes, Your Honor. But like I said, our argument is that that pause was legally sufficient to make them two separate transactions, and that she wasn't involved in the second transaction. If I may just very briefly, because I see I'm over my time, just quickly address the other argument that I'm addressing, which is the prosecutorial misconduct argument when the prosecutor is misrepresenting its own witness's testimony in rebuttal on closing argument, which undercut one of the elements, one of the fences, one of the elements of the case, which was the but-for element. Was there any objection to that so-called misstatement by the prosecutor? No, there was not, Your Honor. So you're raising a plain error point, right? Well, Your Honor, we've got a closing argument. Yeah, Your Honor, yes, we're under the case law in this circuit, we are saying that this error was so obvious that the public reputation integrity of the judicial proceeding was impaired, which is. You should have objected that the judge corrected the disruption or something. Well, you know, I was not trial counsel, Your Honor, so. Well, that doesn't make any difference. You're the only lawyer she has. Absolutely. You're the lawyer. I cannot give you an explanation, Your Honor, as to why no objection was made. Well, we can't tell you about the law. One of the problems you have is that you're talking about an error that you did not, that was not made, or the test was not made, that you now say was obvious. But moreover, plain error is a tough standard. Also, this is not even evident. Closing argument. Well, and I understand that, Your Honor, and I do, I would put out in the Werner case, this court pointed out that the defendant is sometimes not required to make a brief objection to, because in order to do so, might have only emphasized the in-principle point antagonized the jury. And what I think is particularly true, Mr. Kennedy, I'm sorry. Go ahead, Judge King. I was going to say, we'd have to assume that the lawyer, your predecessor, didn't make the objection because he didn't see fit to make the objection, that it was a prowl tactic. He didn't want to emphasize the point, as Judge Gregory said. You go ahead, JPS. Well, I was simply going to say that that certainly might be a tactical reason for not making the objection in front of the jury, but at some point, the objection has got to be preserved and it wasn't here. And the other, I guess the other point I would make is, what is it, I mean, the judge in this case, I believe, gave an instruction to the jury as part of the overall charge that the arguments of lawyers is not evidence and it's up to the jury to recollect the evidence as best they determined it. And so it seems to me that that instruction at least goes a long way in ameliorating whatever potential harm might've occurred in this case with respect to that single misstatement, right? It was just one time that the prosecutor misspoke. Is that right? Yes, Your Honor. It was one time that the prosecutor misspoke, but the statement actually was that she, like I said, she essentially called Mr. Moss, who was trial counsel, a liar by saying that when he said in his closing argument that coding metabolized into morphine, which was being asserted to show reasonable doubt as to where the morphine came from, which led to Marcotto's death, because the evidence also showed that he was carrying around a bottle of codeine and drinking it that night. Then she said that what Mr. Moss said to you was incorrect, that codeine does not turn to morphine, morphine turns into codeine, which was completely contrary to what her own science expert said that was contributed testimony. And so I think this is particularly egregious because it was done on rebuttal, so the defense had no opportunity to address the jury again after that. And also because it undercuts the forecast and essentially cuts the defense's legs out from under them. And as this court has found before, a prosecutor has a higher duty than a typical lawyer does because they are an arm of the state. And so what they say is getting a certain sheen by a jury above and beyond what maybe another lawyer would say. And so that's why I think this is particularly important. And I see I'm over my time, so I'd be happy to keep answering questions, but otherwise I'll wait. Thank you, Mr. Kennedy. Mr. Hellman? Thank you, Your Honor. May it please the court, my name is Tim Hellman. I represent the United States in this matter. In this case, the defendants acted together, traveling from Baltimore, Maryland to rural Martinsburg, West Virginia to sell heroin. They had no other personal connections with West Virginia or the Northern District of West Virginia other than to look for a place to sell drugs. On May 28, 2016, Defendant Johnson sold heroin to an adult at a local strip club. A couple hours later, that adult died. Only two days after that, both defendants worked together to sell drugs to some teenagers who were out looking to experiment with cocaine that night. Both defendants lied to the teenagers and told them that the drug they were selling was cocaine when in fact it was actually a bad batch of heroin. One of the teenagers who took the heroin died of an overdose as a result of that. The defendants were convicted at trial and now raised six allegations of error. I'll go ahead and jump right into the issue of the cell phone. And to address the comment that Judge King made earlier, I think Judge King had asked about whether there was any record about who gave it back, when it was given back, so forth. The record was thoroughly developed on that. It was Investigator Brian Bean who had possession of the cell phone. After the defendant had entered a plea of guilty before the family and gave the cell phone back, it was only after all parties believed in good faith at that point that the case was over, the plea was entered, there was going to be no further litigation. That's when investigators… You're saying the defendants were hit on it and they agreed to give it back? No, they didn't, Your Honor. But I think… But you said all parties. You said all the parties agreed to give it back. Now, that's right or wrong. Okay, I'm sorry. Well, I misspoke then. I didn't mean the defendants. What I meant by that is… The defendants say they didn't know anything about the cell phone. You might have had all the… maybe all the prosecutors and the investigators agreed to give it back. Is that what you're saying? No, Your Honor. I don't think that's entirely accurate because the defendant did have possession of several screenshots of text messages that involved the victim's cell phone. Did they know that those screenshots came from a cell phone that had never been identified to them or they didn't know anything about? There were other cell phones involved here. Yes, Your Honor. I'm not sure that that was ever made clear. They said that they didn't know anything about this cell phone. It's the way I understand the record. Until after the plea was rejected is when they found out. And then they made another… they made a supplemental discovery request after the plea was rejected. That's correct, Your Honor. And in that supplemental discovery request, they mysteriously ask and say, upon information and belief, we would like a copy of the cell phone extraction or an opportunity to examine the victim's cell phone. So, I think that… We don't know what they based that on then. Okay. Maybe they had a suspicion at some time. And I think that's because… So, the record's not… maybe the record's not fully developed here about this cell phone for some reason. But the thing was given back. Was it given back? You're saying it was given back intentionally then, not by accident or negligence? Well, it was given back intentionally by Investigator Brian Bean. And there was some testimony at the pretrial hearing. And you all knew… you all knew, the investigators and the prosecutors all knew that the case wasn't over. There wasn't… there'd been no sentencing. There'd been no appeal. A criminal case isn't over when you take a plea under agreement to part of an indictment. If the sentence is… there's a pre-sentence report ordered and the sentence is not made. So, there's no reason, no argument to be made that this case is over. It should give away the evidence. Yes, sir. That's correct. Even if the judge had rejected the plea, we might have reversed it on appeal in a trial. This doesn't make any sense to me. I mean, I've been… I got kicked around on the defense side and the prosecutor's side both with a lot of issues. And this doesn't… the whole thing here doesn't make a lot of sense about this cell phone. Yes, sir. I would agree. It's certainly an unfortunate series of events. Investigator Brian Bean had the cell phone in his possession. There was testimony from the victim's father at the pretrial hearing because he was subpoenaed to the pretrial hearing because there were attempts made to get the cell phone back from the victim's family. And the victim's father testified that they had contacted Brian Bean numerous times asking him for the cell phone because they were afraid that perhaps it was going to be lost or erased. And he had a grieving family who had just lost a son and they just the pictures of their son off the son's cell phone. They just wanted the contents of that cell phone. And so, again, this just really goes to the issue of bad faith. Was Investigator Brian Bean acting with bad faith when he gave it back? And I think the evidence is no. He had a reasonable belief. It was mistaken, but he had a belief that the case, the litigation on the matter, was concluded at that point. It had been in his possession. Judge Groh pointed out, the district court had pointed out, that from the time of indictment to the time that the plea was entered was about three months. So he had it in his possession for about three months before he ultimately gave it back to the victim's family at the victim's request. But that goes to the issue of bad faith, that he wasn't acting in any way to gain a tactical advantage or to hide this from the defense. It was something that he felt like perhaps he had already provided those screenshotted text messages to everybody, and this wasn't something that was on an exhibit list, and he just returned it. Was you aware of it? I was a trial counsel. Both attorneys are no longer with this district, but- The U.S. Attorney's Office was aware of it, correct? No, sir. Not until the discovery request was made by defense counsel. That's when trial counsel got in touch with Investigator Brian Bean and learned for the first time that he did indeed have that phone in his possession, and that's when the response to the discovery request was made. Where did you think the screenshots came from? I'm sorry? Where did the screenshots come from? The screenshots came when Investigator Brian Bean met with the victim's girlfriend, Larkin Hite, I believe her name was, and she took screenshots off of her phone of the conversation between herself and her boyfriend, the victim Mercado Medrano, and she then forwarded those screenshots onto Brian Bean's phone. So that's where he got those exhibits, and those exhibits were provided in discovery and introduced in trial. But does your office have an open file policy? Yes, sir, we do, and I think that weighed into Judge Groh's decision at the district court level, is that there was some responsibility of due diligence on behalf of defense counsel to, hey, pick up the phone and call Brian Bean and ask that, or make an appointment to examine any exhibits or anything that he might have in evidence. It's amazing. I think there's another way around. An open file policy is more a burden is on you, that you don't have to mince words and try to figure out that you've given the file, which includes what the investigator, hey, you do concede that the officer represents the government here, right? I do concede that what the officer had in his possession is imputed to the government, yes, sir. So therefore, an open file, that means more of a duty on you to give it to them, not for them to ask for it. And I think it's just something that trial counsel just simply was not aware existed. But I find it interesting that you question about it. And you started off that way. And I talk about things that really is not to explore really this court in terms of the issue. But I understand a lawyer would do that. You sort of make a jury argument. That's where you started. But that means arguing against you here, because with a case where young people died, a young person died, and a person before that, in a case where you announced a murder case, that you would treat evidence like this, that's when you get it back. I mean, that kind of thing. Because you're talking, this is a case of science. Whenever you talk about someone ingested something that was a level of toxicity, and it led to their death, and these young people are gathered in a social setting and phones, and so everybody knows in and around the teenage and young people, it's the person, then there's the phone, and then there's the phone, then the person. They are unibody. That's one of the first things you would look at, what the telephone, the cell phone, what happened, just like computers. I mean, you wouldn't give a computer back, which is that the victim's computer is there. Would you give that to the family before it's over? Well, Your Honor, I think it turns on the issue of whether or not the computer or phone or whatever it is, is truly material to the case. And that's one of the issues that I think tilts in the government's favor on this matter, is that this phone wasn't really, it wasn't favorable, nor was it material. Well, if you want to know whether it's material, you're going to talk to the lawyers on both sides. And you're saying that it was given back without consulting with the prosecutor, without telling the defense lawyers that it even existed, even though they'd already asked for discovery. They didn't know this phone existed. And then it's given back, and then it's gone by the time they asked for it. And then the plea blows up, and it's a tragic case. Yes, Your Honor. It's a tragic case procedurally on this point. Well, and I think the reason why it's ultimately not a problem is because the phone wasn't favorable, and it wasn't material to any of them. How in the world is anybody supposed to know that? How in the world would anybody know that? Well, I think for a couple of reasons. For one, because of the overwhelming evidence that the government presented at trial. I mean, there was over 20 witnesses that testified, including the four companions of the victim that night, Mercado Medrano, his four companions. They all testified. There was video surveillance footage that was produced that confirmed their testimony. Video surveillance was taken from Walmart and from McDonald's and from Motel 6, and it was pieced together in chronological fashion and presented to the jury. You had the infamous Snapchat photograph that showed Defendant Stewart together with drugs on the table and Mercado Medrano with money in hand outstretched. And there was a testimony from the case on behalf of the government. And the evidence, again, getting back to favorability and materiality, the evidence that the defendant claims would be material to the case was presented to the jury in other fashions. It was made available by other sources. Specifically, they got to introduce the screenshot of the lace blunt and the testimony from the four companions established what Mr. Moss is hoping is on the phone, and that's evidence that the victim tried to seek out other drug transactions that night. The jury heard that. The jury heard testimony that the victim made attempts to get marijuana from one individual and made attempts to get cocaine from another individual, but that both dealers ultimately stood him up, and they heard drugs from those individuals. And then the jury got to see the text message about how he allegedly smoked a lace blunt. And the jury heard testimony that ultimately, on the toxicology report of the victim, there was no cocaine in the system and there was no marijuana in the system. So anything that Mr. Moss claims would have been helpful that was on the phone, the jury heard that and rejected it, and it wasn't ultimately material to their decision. So, Mr. Hellman, the other component of Mr. Moss's argument was, in addition to this issue about the laced blunt, was he seems to suggest that the phone would have uncovered evidence to impeach the witnesses, the four witnesses who testified at the trial, but I don't think he actually ever described what that impeachment evidence is, and maybe that's the answer to my question. But what, how do you respond to that? Well, I would respond by saying politely that I think that's simply a blanket statement regarding impeachment and favorability without any factual basis in the record. You know, as I said, four companions testified, their testimony was corroborated by video surveillance footage. The timing of it all is corroborated with the testimony as well. The video surveillance footage from Motel 6 shows Mercado Medrano, Stewart, and Johnson all entering the motel room first at 11.05 for what we've kind of been referring to here as the first transaction. And then the footage shows them after they left and got the money and came back to buy more drugs. So the video footage shows them arriving at- Mr. Hellman, can I ask a question about this? So what was the defense theory at trial? Was it that they never sold these kidney drugs or that if they sold the drugs, that wasn't the cause of death? Which one is it? I think it was the second one in part was that they were arguing that the government couldn't show the but-for causation, that the drugs distributed by the defendants caused the death. And they were hoping, I think, to be able to point to the fact that- and again, I think their whole argument in this case rests on the theory that victim Mercado Medrano not only met with, but obtained heroin from another source that night. That's- you know, if there was some evidence in the record to indicate that- And that's what they would say, I think, about something about that phone, that that phone would have indicated that there were phone calls made to some other drug dealer where they could have gotten drugs from another source. And I can't understand if all- if you've got all this argument about it's not material and it wouldn't have made any difference and all that, it would have been looked a lot better if you had agreed to the spoilation instruction and given them a fair trial with respect to the fact that the phone was gone. The very argument that you're making this morning could have been made to the jury in connection with the instruction on spoilation of evidence. And then if you'd have gotten a guilty verdict, you'd have had it resolved by the jury. But you objected to that instruction and the judge didn't give it. So now you're sticking us with trying to decide whether that's reversible error or not. Yes, sir. As to the issue of the adverse instruction, that also, I believe, turns on whether or not the evidence was material and whether or not there was bad faith. You know, I would say I think the court ruled correctly- I don't think it had to be in bad faith. It could have been accident. There could have been negligence. It made a mistake. You don't have to have- you don't have to have bad faith to commit a crime. I don't think. Well, on the issue of an adverse inference instruction, the case cited in the government's brief, Hodge v. Walmart stores, indicates- now, granted that was a civil case, but nevertheless, this court- It's a civil case, yeah. Yes, sir. But it still examined the issue of whether or not a negative inference instruction should be given in a circumstance where one of the parties allegedly destroyed evidence. And in that case stated that a negative inference cannot be drawn merely from negligent loss or destruction of evidence, but requires a showing that the party knew that the evidence was relevant to some issue and that willful conduct resulted in the loss or destruction. And I think, put another way, that Hodge v. Walmart stores case was stating that, look, before a negative inference instruction is given, there has to be a showing of bad faith. There was another analogous case, United States v. Clark. Now, this was a criminal case and that was regarding a negative inference instruction regarding a missing witness relating to some audio tapes. But in that U.S. v. Clark case, the court held that the defendant must make a showing at trial that it is reasonably probable that the missing evidence would have proven helpful in some way. And I think that's issue of materiality, that ultimately there's nothing in the record to indicate that the victim met with and obtained drugs from another source that night. Sure, speculation is not enough to satisfy a Brady plan. There's got to be something in the record in order to give the defense's argument some traction regarding materiality. When the evidence has been thrown away or given away and stolen, about all you've got left is speculation and looking at the circumstances. Well, sir, I think if there had been some testimony, perhaps from one of the four companions that night, if there had been some testimony to the effect of, hey, yeah, he said he not only wanted to get cocaine, he was looking for some heroin too, or that, yeah, he actually did meet up with somebody, then their argument would have some more traction. But all four of the witnesses were consistent in saying that drugs weren't obtained from any other source that night. And then that's also consistent with the toxicology report of the victim's substances in the bloodstream, that it only showed positive for heroin. There was no heroin, the substance that the victim was not even seeking that night. I say I'm about out of time. I haven't really been able to touch on the other issues yet. I wanted to ask you about, before you sit down, I wanted to ask you about the sentencing. Now, the male defendant here, his IQ was, what, 65? I believe that's what the expert witness testified to at the sentencing. And was that adequately dealt with? They say it wasn't in the sentencing procedure. Well, your honors, to the issue of whether or not defendant Johnson's sentencing was procedurally reasonable, I would argue that it was because the district court gave an individualized assessment on that point. As this court has stated in the case of United States v. Harris, the sentencing court's explanation need not be extensive, but the record must make clear that the judge actually listens to, considered, and rendered a decision on these arguments such that this court can conduct a meaningful review of the sentence imposed for appellate purposes. And I think that's what we have here. When you look at the record, I think it's clear that the district court judge heard all the lengthy testimony from the expert witness that was presented. She gave all parties an opportunity to speak extensively on the issue, to make their full arguments, to make up their record. And then she gave very individualized assessment of the things that weighed into her sentencing decision. She didn't just go through a mechanical recitation of, say, the 35-53 factors, but she referenced things about the defendant being from Baltimore and having no ties to the Northern District of West Virginia. Was that a proper consideration, the fact that they were from Maryland and Baltimore? Well, she did talk about that. It was in the sentence being predicated on that to some extent. Is that proper? I think so. Yes, your honor, I believe so. It's not so much that he's being punished for being an out-of-state defendant, but that the court found it significant that you have some individual... They got a recent case that talks about that, McCall or McFall or something, that Judge Richardson wrote. He was criticized for taking that into account. Well, your honor, I would say the judge's sentencing decision was not punishing them for being out-of-state necessarily, but the court found that it, I believe, went to the issue of their criminal responsibility in this matter, that they just went to a rural town where they didn't have any family connections or nothing, and they found kids. Well, that's a rural town, Martinsburg, West Virginia. That's a pretty large place as far as West Virginia's concerned. As far as West Virginia's concerned, yes, sir. I think in comparison to some of the nearby metro areas. But she pointed out that they came and they set up shop in a Motel 6 room to prey 12 to 16, and then the victim, Mercado Medrano, who was age 18, that weighed into her decision, and that she found it disturbing that not only did they sell drugs the first time, but then, as she said, the defendant Johnson took Mercado Medrano back to the well for more, meaning that he escorted Mercado Medrano to the ATM machine to get $300 more to get more money. She also addressed his lack of remorse during the trial, and then this threatening note that he passed to his co-defendant during the trial, where he made a threatening statement about how, and he used the word B-I-T-C-H, you better not turn your back on me. The court found that very disturbing. Mr. Hellman, can I ask about the sentencing issue? So, as I understood the defense's trial, Johnson's counsel made a plea for leniency in the form of both the departure and the variance based on the defendant's mental disabilities. And with respect to the departure, it's clear that in order to warrant the departure, you've got to show both that there is a significantly reduced mental capacity first, and second, that that significantly reduced mental capacity contributed substantially to the commission of the offense. And it's clear that the district court did not find that in this case. But then you've got the separate question of a variance, and I have a concern about whether or not the district court then separately sort of kept these apart and considered whether or not that diminished mental capacity, whether she considered it independently of whether there was any causation element satisfied. In other words, that's just general mitigation evidence that the district court, it seemed to me, was required to consider. And she didn't say anything about that beyond finding that the departure didn't apply. So, it didn't apply. So, can you address that? Well, Your Honor is correct that she did state that she did not find that the downward departure applied. And I think at that point, did not grant the variance because the expert witness's testimony was not particularly compelling. Did she say that? Did the judge say that? Not expressly, Your Honor. How do we know that? Not expressly. She didn't say it. Let's say she didn't say it. She did not say it. I mean, the record's clear that the sentencing transcript speaks for itself. You know, she didn't say it. But I think when you look at the things that she did say, that's when it makes clear that, you know, hey, the judge thought this testimony was baloney. And, you know, if this guy is so impaired, if he's so disabled mentally, how is it that he's sophisticated enough to hatch a plot to book a motel room over in Martinsburg, West Virginia, in a Motel 6, and set up shop there, and make two different sales, and meet these kids at the McDonald's, and to know enough to escort the victim, Ricardo Medrano, back to the ATM machine to get more money? You know, can you say anything that's complex in terms of activity? Booking a hotel room, selling drugs, beating someone out of the ATM, do you consider that to be complex activity? I think for an average individual, it's not necessarily complex. But somebody who's allegedly to have a 65 IQ, somebody who's, they're claiming to have a severe mental disability, I think those types of things would be complex for somebody, if the condition is severe, as the expert. Well, Your Honor, there's evidence, specifically the email address that defendant Stewart used to help secure the booking of the motel room. Even though the whole context, he didn't do this alone, by your own allegations. I agree with Your Honor completely on that. He was not acting alone. The two of them were in for a penny, in for a pound on the entire thing, from beginning to end. So then why would you tell us then that this evidence is clearly, must be recalled as baloney, and that's your word, baloney, because he did this by himself. This case is not fair. Well, if I said that he was doing it by himself, I apologize if that's the expression that you- Well, let me ask you about, what about, what you said is complex. You said, well, well, for an average person, a person with his heart, but he, this case, he was not doing it alone, by your own facts, in which the case was found here, right? You agree that the court must address non-frivolous arguments for mitigation. I think that's definitely the reason. Do you think that's the law? I would agree with you that that's the case law, yes, sir. All right. So do you think that saying someone has a 65 intelligence fortune number is frivolous? No, sir. I do not believe that was a frivolous argument that was made. What evidence did you put on to contradict the expert testimony? Well, I think it was the evidence that the judge- That's the question. What evidence did you put on to contradict the expert testimony? The government did not put on any expert witnesses, no. Okay. Okay. All right. Go ahead. Let's see. I'm at nine minutes and 30 seconds over. I believe- That's what your time is. Go ahead. Okay. Thank you, Ron. Unless there's a question from my colleague, I'll give you a minute to wrap up. I hadn't had an opportunity yet to address the issues raised by Mr. Kennedy, if I may have just a couple moments to address that. On the prosecutor's misstatements, I think the court's already identified that has to be reviewed on a plain error analysis at this point because it wasn't objected to at trial. The comments were extremely isolated. As I was looking at that, for one, the prosecutor's comments were not a deliberately calculated premeditated attempt to misrepresent the evidence or divert things from the jury. It was plain and simple. It was a heat of the moment brain goop that she made. She misremembered the evidence as it actually came out. As I looked at the rebuttal, now again, this didn't take place in the opening part of her closing argument, the main body of it. I think that goes to show how it was heat of the moment, but it took place only in the rebuttal. It was an isolated point. Of the five and a half pages of rebuttal transcript that she argued, only one paragraph was directed on this comment. I counted up the lines. It was 12 transcript lines out of 136 transcript lines of rebuttal. The remarks were very isolated. The bulk of the government's argument was on the strength of the case. The thing that I want to point out is if there was any potential issue by those 12 lines of rebuttal argument, it certainly would have been cured by the judge's instructions to the jury. The judge's instructions of the jury clearly state, and that's up on joint appendix 1290, any reference by the court or counsel as to matters of evidence that doesn't coincide with your own recollection, it's your recollection which should control during your deliberation. The jury was instructed on that. The jury was also instructed previously that questions, statements, and arguments of counsel are not evidence in the case unless they remain as an admission or stipulation of fact. A third time, actually, the charge to the jury at the beginning of the case, at JA447, the instructions of the court as the jury is seated, she says certain things are not evidence and must not be considered by you. I'm going to list them now. One, statements, arguments, and questions by lawyers are not evidence. At three different points in the trial, the jury was instructed that, hey, listen to me, I assume you've had several jury trials? Yes, sir. Can you tell me how many of them have you waived closing argument? I've never waived a closing argument. There's been occasion that I've waived rebuttal when I didn't feel like I needed to beat a dead horse any further. And it's something you never have. I suggest that probably most lawyers never have because they're important. Yes, sir. They are. Okay. All right. Then I did want to also touch on the issue regarding the district court's proper denial of Defendant Stewart's motion for judgment of acquittal. And I do appreciate Judge Diaz already being very familiar with the facts on this. When viewed in a light most favorable to the government, there was ample evidence for which a jury could find that Defendant Stewart aided and abetted the distribution of heroin that resulted in the death of Mercado Medrano. There was the issue of the email address that I already referenced. Evidence was presented to the jury, video surveillance that both defendants arrived at the Motel 6 together with Defendant Stewart carrying the duffel bag that contained the drugs. The video and witness testimony confirms that it was Defendant Stewart who initially approached Mercado Medrano at McDonald's and she's the one that made the initial contact and arranged the first drug transaction. The video surveillance shows Johnson Stewart and Mercado Medrano together leaving the McDonald's and then walking across the street over towards the Motel 6 room. The video surveillance shows they entered that room at about 11.05. The video surveillance, excuse me, witness testimony from the four companions established that it was Stewart who actually showed them how to use the drugs because these were teens, they weren't too familiar with it. She cut the drugs with a credit card and then taught them how to roll up a bill and snort it up their nose. It was Stewart who waited behind with the three boys in the Motel 6 room while Johnson took Mercado Medrano to get more money. She was guarding the drugs at that point. She was waiting behind to guard the drugs and keep the customer's company while Johnson went ahead and secured the larger $300 sale. Johnson and Mercado Medrano returned to the Motel 6 at 11.58 p.m. and they completed what Mr. Kennedy has been referring to as the second transaction. Well, at that time, 11.58 p.m. is when Levi Connelly, one of the companions, posted a Snapchat photo. That's a Snapchat photo that was presented to the jury that showed Mercado Medrano in front of a table with a handful of money and drugs on the table and defendant Stewart right there next to him. Now, the district court found that there was ample evidence by which a jury could just view this as one act, one criminal act. Your Honor, Judge Gregory pointed out that this was just minutes at best. That's correct. From the time stamps of the Motel 6 entries of the room, we know that the two different entries between the two rooms were about 53 minutes. In all likelihood, the first distribution, if you call it that, and the second distribution were really only about 45 minutes apart from when that took place. Although the drugs may have technically been distributed twice, the law treats that as one criminal act. U.S. v. Elliott states that multiple acts of physical delivery, which, although technically discrete, occurred essentially at the same time in the same place and with the same participants, must be considered a single offense for purposes of punishment. I think either way you look at it, if you view it as one distribution, well, it's short in time. It involves all the same parties. Everybody was still there. It was at the same location. I think there's plenty of evidence by which a rational jury could find it was one distribution. But I think even so, even if you view it as two distributions, the evidence that I just rattled off a moment ago makes it pretty clear. She was in for a penny and for a pound with both transactions, and they only happened about roughly 45 minutes apart from them. The district court very clearly denied the motion for judgment of acquittal. I think that addresses all the issues that were raised in oral argument initially. I would say that the United States stands upon all arguments set forth in its brief and asks this court to affirm the district court's rulings on all issues. And if there's any other questions at this point, I'd be more than happy to answer them. All right. Thank you, Mr. Hellman. Thank you, Your Honors. Mr. Moss. Thank you, Your Honor. Your Honor, the government's failure to provide inquiry notice that possessed the cell phone, in conjunction with its failure to follow any established procedure, conduct any analysis of the evidence, or otherwise preserve it, amounts to bad faith and violation of due process that irreparably prejudice the defendant. The convictions must be vacated. To rule in favor of the government would send a message not to affirmatively disclose the possession of evidence with apparent relevance, nor conduct any analysis of it and to dispose of it prior to trial, and then hide behind the argument that the defendant cannot say what the evidence is to say whether or not it was exculpatory. It would undermine a fundamental premise of due process that a defendant can be convicted only upon confident evidence, and it would also open the door to future abuses of an important corollary principle to due process, which is that the defendant is entitled to be made aware of and to use all evidence. It would mean no check on the suppression and destruction of evidence because law enforcement agents would be able to defend the failure to disclose or the destruction of evidence by essentially violating with impunity the procedures that are in place that they're obligated to follow, and these are the very same procedures that exist to ensure a competent, credible, and transparent criminal investigation and prosecution takes place, as Mr. Kennedy said, to help ensure the public reputation and the integrity of the judicial proceeding and make sure it's reliably free from bias or other forms of misconduct. But a ruling in favor of the government would again signal them that it is okay to ignore their own governing procedure, acting consistently with it, and without fear of even the slightest repercussions. Mr. Johnson's conviction should be vacated. If somehow the court determines it is proper to affirm, Mr. Johnson's case should still be remanded for resentencing. His sentence was procedurally unreasonable because, as Your Honor pointed out, the district court erred by failing to address or explain why it rejected non-frivolous arguments. I don't think it was patently obvious why they rejected the departure, and I agree with the court that they never addressed the argument for variance. Both, of course, were based on the childhood-led paint poisoning, intellectual disability, and diminished capacity. I think that the record speaks for itself here, and it's insufficient to support a meaningful public review on that issue. So the sentence was procedurally unreasonable. To just quickly, you know, I am a minute over. Your Honor, I will stand on the arguments of the brief. I am happy to answer any other questions that the court has, but I would ask that Mr. Johnson's conviction be vacated. Thank you. Thank you, Mr. Miles. Mr. Kennedy? Thank you, Your Honor. Just really quickly, I wanted to first address Enactees v. Elliott, which was brought up by the government. Enactees v. Elliott, one of the elements in order to find that they're a single offense is that they have to have the same participants. That was not the case here. In the first transaction, Johnson, Stewart, Medrano, Beal, and Conley were the participants. However, in the second transaction, Johnson, Mercado, and Haynes were participants. So in both of the sales, there were people involved that weren't involved in the other sales, so that means that it doesn't meet the Enactees v. Elliott test. And also, addressing the acquittal argument again really quickly, all the activity that the government cited in its oral argument as being evidence of Stewart's participation was before the pause that we talked about. And the only evidence that the government cited in oral argument that she was involved in the second transaction was a Snapchat photo, which we would take the position that was mere presence. Also, I think it's important to note that Conley from the first transaction, but not the second, did not test positive for morphine, which I think, again, is an inconsistency in the government's case. And just really quickly again to hit the closing argument, I just want to cite to the court really quickly that what the science was that was testified to by the government's own expert is that heroin turns into morphine. Codeine also turns into morphine when they enter the human body, and that once they're in there, you can't tell where the morphine came from, whether it came from heroin, codeine, or something else. And that's what the defense was arguing. And by saying what the prosecutor said in the rebuttal, it undercut that argument because not only did she say, no, that's not what happens, morphine turns into codeine. And also then she said that defense counsel who had correctly stated the science was wrong in misleading the jury. And that goes to the but-for-cause element here. And so, therefore, it was a particularly egregious misstatement. And so, unless the court has any further questions for me, I see I'm out of time, so I would stand on the arguments from our brief and also ask that Ms. Stewart's conviction be reversed. Thank you. Thank you, counsel. We'll extend a virtual handshake to all of you and express our appreciation for your fine work in the argument. Thank you so much. Wish you well, be safe. Thank you. Thank you, your honors. Thank you, your honors.
judges: Roger L. Gregory, Robert B. King, Albert Diaz